## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LAURIE A. REO,                            :
                                          :
                    Plaintiff,            :
                                          :
        v.                                :        C.A. No. 07-369-SLR-MPT
                                          :
MICHAEL J. ASTRUE, Commissioner of        :
Social Security,                          :
                                          :
                    Defendant.            :

## REPORT AND RECOMMENDATION

**Introduction**

        Laurie A. Reo ("plaintiff") filed this action under 42 U.S.C. § 1383(c)(3) against

Michael J. Astrue, Commissioner of Social Security Administration ("defendant") on June

11, 2007.  Plaintiff seeks a judicial review under 42 U.S.C. § 405(g) of defendant's final

decision denying plaintiff disability income benefits under Title XVI of the Social Security

Act ("Act").[1]  Currently before the court are the parties' cross-motions for summary

judgment.

**Jurisdiction**

        A district court has the jurisdiction to review an administrative law judge's ("ALJ")

decision in an SSI disability benefits case once it becomes the final decision of the

Commissioner.[2]  A decision of the Commissioner becomes final when the Appeals

_____

        [1] *See* 42 U.S.C §§ 1381-1383f.
        [2] 42 U.S.C. § 405(g) ("Any individual, after any final decision of the
Commissioner of Social Security made after a hearing to which he was a party . . . may
obtain a review of such decision by a civil action . . . brought in the district court of the
United States for the judicial district in which the plaintiff resides.")

Council either affirms the ALJ's decision, denies review of an ALJ's decision, or when claimant fails to appeal the ALJ's decision within 60 days of unfavorable ruling.[3]

Here, ALJ's decision is the final decision of the Commissioner because the Appeals Counsel denied plaintiff's request for appeal.  Therefore, this court has jurisdiction to review the ALJ's decision.

**Procedural Background**

Plaintiff originally applied for supplemental security income ("SSI") benefits on December 12, 2001.  The Social Security Administration denied her claim on March 26, 2002 and plaintiff did not request a post-denial review.

Plaintiff re-applied for SSI on November 5, 2004, asserting permanent disability due to chronic back pain and muscle/tissue damage – a direct result of her involvement in a motor vehicle collision on May 26, 2000.

The Social Security Administration denied this claim twice – when plaintiff re-applied and upon reconsideration.  Subsequently, the plaintiff requested a hearing before the ALJ.

This hearing was held on March 23, 2006. Plaintiff, who was represented by counsel, testified before the ALJ.  An impartial Vocational Expert ("VE"), Beth M. Kelley, also testified.

The ALJ found, based on the hearing testimony and the record, that plaintiff is not disabled within the meaning of § 1614(a)(3)(A) of the Act and, therefore, not eligible for SSI.  On July 25, 2006, the ALJ buttressed his determination with a detailed and well-

---

[3] *See* 20 C. F. R. § 416.1455;  *see also* 20 C.F.R. § 404.905

reasoned decision.

The Appeals Council denied plaintiff's request to review the ALJ's decision on May 23, 2007. Thus, the ALJ's decision became the final decision of the Commissioner. Thereafter, plaintiff brought the present action seeking judicial review of the ALJ's final decision.

**Medical Evidence**[4]

On May 26, 2000, plaintiff walked into the Kimball Medical Center Emergency Room complaining of general soreness, mild headache and neck discomfort as a result of a prior motor vehicle accident. Plaintiff was stable, alert, cooperative and in no distress throughout the treatment. Her extremity strength, sensation and deep tendon reflexes were within normal limits. No X-rays were taken. The treating E.R. physician prescribed Motrin 800 mg. and Valium 5 mg., and subsequently discharged plaintiff.

A July 15, 2000 MRI scan of the thoracic spine was negative for any disc herniation or stenosis. Mild degenerative changes and an osteophyte at L7-8 level did not cause any neural element impingement. A subsequent review of the MRI by Scott Metzger, M.D. confirmed that the herniation was insignificant.

A July 22, 2000 MRI of the lumbosacral spine showed no evidence of any focal disc herniation. There was no canal stenosis. Some foraminal stenosis at the L3-4 level on the left side was noted. Dr. Metzger diagnosed, upon subsequent review, a left-sided small foraminal herniation at L2-3, and a broad-based foraminal herniation at L3-4.

Dr. Grossman, an orthopedist, evaluated plaintiff on three occasions for

---

[4] All facts and medical information referenced herein are found in D.I. 8, 11, 15.

complaints related to the auto accident:  two weeks after the accident, on August 16 and September 27, 2000.  He interpreted the x-rays of the thoracic and lumbar spine as showing questionable changes at the T12-L1 level.  He also interpreted the MRI images to show foraminal type irritations at L3, especially on the left side.  A repeat MRI of the lumbar spine showed left lateral bulging disc and some ligamentum flavum thickening from L3 to S1.  EMGs were thereafter obtained, but they failed to reveal any pathology. Dr. Grossman consulted with Dr. Anayiotos, who could not identify an abnormal H-reflex and felt that plaintiff did not have disc disease.  Dr. Grossman initially prescribed Daypro, an anti-inflammatory medication, along with Valium for muscle spasms.

Dr. Grossman performed another clinical evaluation of plaintiff on August 16, 2000, which revealed a negative straight leg raising result on the left side and a positive result on the right at 60º.  Reflexes were normal.  Dorsiflexion ability was slightly decreased in her right foot.  He replaced Daypro with Lodine and added Percocet for pain.  He also referred plaintiff to Dr. Metzger for an epidurogram and an epidural block injection.

Dr. Grossman's performed a final examination of plaintiff on September 27, 2000 during which he noted a possibility of the L4-5 disc disease.  In a March 12, 2001 letter to plaintiff's no-fault attorney, John G. Mennie, Esq., Dr. Grossman opined that plaintiff is disabled by her back problem, but stressed that there was no clear explanation for her disability other than some mild to moderate degenerative changes at L2-3 and L3-4, which were not surgically amenable.

On August 25, 2000, Dr. Metzger began treating plaintiff for lumbar radiculopathy through lumbar epidural steroid injections and an epidurogram.

On January 5, 2001, John Sarris, M.D. examined plaintiff and found her tender to palpitation along the posterior aspect of the cervical spine and the lower thoracic and lumbosacral spine.  She had good flexion and extension of the neck with mild decrease on turning to the right and left.  Motor strength test was normal in both the upper and lower extremities, with some limitation in deltoid strength and slight giveway in the right ankle dorsiflexion.  Dr. Sarris also noted negative straight leg raising bilaterally and some difficulty in heal and toe walking.  Dr. Sarris concluded that plaintiff did not suffer from significant radiculopathy or myelopathy, based on the physical examination and thoracic/lumbosacral MRI studies.  Therefore, he recommended a conservative course of treatment through physical therapy.  Dr. Sarris reported his findings to Dr. Grossman and stressed that he found no disc which required surgical intervention, while expressing concern for foraminal type disc disease.

On February 15, 2001, plaintiff underwent a behavioral medical/pain management examination by Brett J. Prince, Ph.D., who diagnosed her with lumbar pain syndrome and psychological factors affecting medical condition.  He recommended for plaintiff to continue physical therapy and anesthesiology care under Dr. Metzger.  He also stressed that plaintiff reduce caffeine and nicotine intake.

On February 26, 2001, Dr. Metzger noted that plaintiff was doing well on the Lidoderm patch, Lodine 500mg twice daily and Disipramine 50mg at night.  Her progression in physical therapy was good.  Plaintiff reported that she was physically active, and did exercises at home.  Dr. Metzger continued with the medical pain management regimen.

During an office visit on March 30, 2001, plaintiff reported an overall improvement

in her condition to Dr. Sarris.  She stated that physical therapy helped relieve her pain.

Dr. Sarris recommended another four week physical therapy course.  However, plaintiff

did not complete that treatment.

Plaintiff returned to Dr. Sarris on June 8, 2001.  She reported good relief with the

Lidocaine patch and nerve blocks.  Dr. Sarris diagnosed chronic back pain syndrome

and recommended a continuation of her pain management program.  He found no

significant myelopathy or radiculopathy.  He also concluded that an MRI of thoracic and

lumbosacral spine showed no significant pathology warranting surgery.

On June 1, 2001, Dr. Metzger reiterated continued improvement by plaintiff on the

pain management plan.  He noted that plaintiff could perform all necessary activities and

stand and walk for prolonged periods, albeit with a slowed gait.  Plaintiff advised that

physical therapy offered no significant relief, so she discontinued it in March 2001.

By November 5, 2001, plaintiff stopped taking the prescribed narcotic medication

because the alleged side effects interfered with her ability to care for her two children.

Instead, she took over-the-counter medication, which provided relief.  At that time,

plaintiff underwent lumbar facet joint injections.  Plaintiff did well with the injections until

December 9, 2002, when she reported less pain relief.  As a result, Dr. Metzger

recommended and, subsequently, performed bilateral L4-5, L5-6 and L6-S1 facet joint

radiofrequency lesioning of the blocked joints.  Dr. Metzger performed this procedure

three times, roughly once a year, with the last one occurring on March 30, 2005.

On November 12, 2003, Dr. Somori examined plaintiff and noted lower back

tenderness and no sensory or motor deficits.

In March 2005, Prudencio Rosas, M.D. performed a single examination of

6

plaintiff for the Delaware Disability Determination Service ("DDS").[5]  Plaintiff advised Dr. Rosas that she did not use any ambulatory support, such as a cane, and the procedures by Dr. Metzger relieved about 60 percent of her pain for eight months.  She refused any rigorous physical examination maneuvers for fear of aggravating her back pain.  Dr. Rosas noted that plaintiff frequently requested to stand up during the examination in an apparent attempt to relieve back discomfort.  Plaintiff grimaced and complained throughout the evaluation.  Dr. Rosas noted paravertebral spasm.  Plaintiff had to hold the wall to flex her back to 80º.  No gross motor deficiency or muscle atrophy was found. Plaintiff walked gingerly with a stable gait.  Dr. Rosas noted that no medical records were available to review.  She diagnosed post-traumatic low back pain.  Also, she noted the possibility of discogenic degenerative disease and cervical radiculopathy.

On August 4, 2005, plaintiff was examined by Dr. Sabbagh, who found neck and back stiffness.  Dr. Sabbagh questioned the severity of her complaints by noting that plaintiff claimed that "[s]he cannot flex or ext[end] her back, yet when she walks she appears to have more motion in her neck and back.  When seated she cannot bring her leg to full ext[ention] but does not require any assistive device to walk."  Dr. Sabbagh reviewed the x-rays taken in his office on the same day which showed mild degenerative changes with no fractures, lesions or instability.  His diagnosis was chronic back pain.

---

[5] The Disability Determination Services is a state administered federal program that serves Delawareans who are unable to work because of a disability.  The DDS develops, adjudicates, and processes disability claims of residents for Social Security disability benefits.  DDS is governed by the Social Security Administration and is 100% federally funded.

7

**Residual Functional Capacity Assessment Test**

On May 3, 2005, a DDS medical consultant reviewed the record and issued a residual functional capacity assessment of plaintiff.  He concluded that plaintiff has the residual functional capacity to sit (with normal breaks) for about six hours in an eight-hour workday, stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday, occasionally lift and/or carry weight of up to ten pounds, unlimitedly push and/or pull (including operation of hand and/or foot controls) and occasionally climb (stairs/ladders), balance, stoop, kneel, crouch and crawl.  He supported his determination as follows:  "She was able to walk gingerly, but on exam[ination] could hardly elevate on toe/heel walking.  No gross motion deficit in the lower extremity.  Tenderness and opasion in the lumbar area.  Reduced range of motion and grip strength on the right [side] with questionable effort."

He opined that symptoms were attributable to a medically determinable impairment, and that the severity and duration of symptoms were proportional to the expected severity and duration of those medical impairments.  However, he found plaintiff's subjective complaints only partially credible when he compared the consistency of symptoms and their alleged effect on daily functioning with the total medical and non-medical evidence, which included Activities of Daily Living ("ADLs") and alterations of her usual behavioral habits.  He could not establish the extent of plaintiff's manipulative, visual, communicative and environmental limitations.

On June 30, 2005, another medical consultant reviewed the record, ADLs and the pain questionnaire.  He concluded that "ADLs and pain questionnaires give an impression that claimant is an invalid;" but found that her medical record was "only

partially to relatively consistent".  He concluded that plaintiff has a residual functional

capacity to perform sedentary work.[6]

**Plaintiff's subjective accounts of pain**

Plaintiff submitted a typed Personal Pain Questionnaire to Social Security on

June 30, 2005, indicating constant and severe pain specific to the back, from just below

the shoulder blade to just below the waist, and frequent migraine headaches.  Plaintiff

described the back pain as "chronic and acute with aches, stabbing and burning, sharp

and dull and severe" that occurred while performing any activity like walking, standing,

sitting and reaching.  She noted occasional shooting pains from the back of her legs

down, radiating to the outside of her calves.  Episodes of severe pain lasted for up to a

week.  Plaintiff claimed that the severity of pain generally depended on the level of

activity and usually subsided when she laid down.  Sometimes, however, the pain would

persist while she was supine.  Plaintiff could not pinpoint a specific physical activity that

consistently triggered her pain; instead she stated that any activity could potentially

cause it.  She provided some examples: bending below the knee, coughing, sneezing,

exposure to cold weather, and even picking up a napkin.  Plaintiff also claimed a loss of

strength in her arms.  She stated that she could no longer stand up straight due to the

injury.  Plaintiff claimed the need to concentrate on her foot placement while walking

because her right foot went numb and would drag.  She had not slept well in five years

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. 404.1567(a).

and frequently awoke during the night.  She noted that her pain became bearable with radio frequency blocks.  She could not drive because of the loss of mobility in her neck, and could only be a passenger in vehicles with armrests, which allowed her to reduce the pressure on her back.  She maintained that her lower back was so sensitive to touch that her children had to hug her without touching her back.

**Activities of Daily Living Questionnaire**

Plaintiff completed a detailed account of her daily activities on February 23, 2005, in which she advised that she required no assistance with personal needs, including daily showering or bathing.  She could also perform household chores, such as, dishwashing, housecleaning, and cooking.

Every morning she laid out clothes for her 7 year old son, and fed him breakfast. A neighbor walked him to school, because she could not do it herself.  Plaintiff assisted her son daily with homework assignments and prepared him for bed, removed the bed covers and read to him before bedtime.

Plaintiff claimed that she laid down three times a day for an average of one hour at a time to relieve the pain.  She stated that she could not write for a prolonged time period and could no longer draw and paint because her hands shake.

According to the questionnaire, her sons assist with activities that required reaching and lifting because, at times, lifting a gallon of milk was "a challenge."  Her children also gathered the laundry, and loaded and unloaded the washing machine.

Because plaintiff does not drive, her mother provides weekly transportation to the grocery store.

**The Administrative Law Hearing**

    **Plaintiff's Testimony**

Plaintiff testified that she suffers from migraines several times a month which last for several days.  Aspirin relieves the pain.  She noted loss of mobility in her neck, and that she cannot lift her arms above her head.

With the help of her attorney, plaintiff demonstrated her motor limitations to the ALJ.  She testified that her arm strength is reduced and they have a Parkinson-like shake.  She claimed that her back "goes out" when she does any physical activity which requires lifting, reaching or standing.  As a result, she guards against quick movements as they aggravate the pain.

Plaintiff stated that she can walk slowly, and when standing in a store, she leans against a shelf for support.  She does not use a cane.  Plaintiff explained that a cane is unnecessary around her house, because of its small size and she can lean on the furniture.  She does not use a cane outside the home because it does not provide adequate support on certain surfaces.  Plaintiff related that a cane was unsafe because it could slide on slippery floors.  However, she is comfortable walking on the same floor without any support.

According to plaintiff, her mother packs and unloads the groceries for her; she is able to store the groceries with the help of her son.  She pays a neighbor to walk her son to school because she cannot walk that distance (three-tenths of a mile).

Since the accident, constant pain interrupts her sleep.  She can not lay in bed the entire night, but must sit in a chair with armrests to relieve her back pain.

Plaintiff has developed a system for daily living to prevent pain.  For example, she only brews four-to-six cups of coffee at a time because she cannot lift a full pot.

According to plaintiff, because of the expense, she only applies Lidoderm patch when she goes out, and uses Darvacet sparingly.  She does not like the side effects of other pain medications and aspirin relieves severe pain.  During the hearing, plaintiff complained of difficulty with concentrating because of pain.

Plaintiff did not feel that she could work as a cashier because she needs to lay down every half hour for thirty minutes.

She testified that the nerve blocks relieved the pain, but that treatment was limited because of health insurance complications.  Regarding physical therapy, plaintiff claimed that it did not help.

Plaintiff advised that the maximum weight she can lift is a half a gallon of milk.  She can walk for only twenty minutes and stand unassisted for about 5 minutes, before the pain becomes unbearable.

**Vocational Evidence**

A vocation expert testified and was asked by the ALJ the following hypothetical question:

> I'd like for you to assume a person who's 40 years of age on her application date, past relevant work as indicated.  She has 12th grade education plus 2 years of college towards her BA degree. She is right-handed by nature, suffers generally and mostly from degenerative disc disease, which causes her to have moderate pain and discomfort most of the time, severe on occasion.  She indicates she derives some spasms as a result of that and some radiation to the extremity.  She indicates in her testimony today that she has some headaches associated with it on occasion, she mentioned two to three times a month, and if I find that she needs to have a sit/stand option every 20 minutes or so, able to lift 10 pounds on occasion, stand 20 minutes, sit

30 minutes, having to avoid, however, overhead reaching, temperature and
humidity extremes, avoid heights and hazardous machinery, of course,
simple routine unskilled jobs due to sedentary work with those limitations,
are there jobs that such a person could do in your opinion with those
limitations in significant numbers?

The VE testified that the following jobs are available nationally and regionally to
an individual with such limitations:[7] assemblers of small products at 125,000 jobs in the
national economy, and approximately 600 regionally; hand packers at 15,000 jobs
nationally, and 100 in the region; and product inspectors at 30,000 positions nationally,
and approximately 200 regionally.

The VE advised that plaintiff could not perform her previous employment,
considering the hypothesized limitations.

Plaintiff's counsel posed the following hypothetical question to the VE. "Assume
the same hypothetical but the person has to take a 15 minute break every 30 minutes
. . . would the person be able to do any of those jobs you mentioned?" The VE
responded that a person with those limitations would not be able to perform the jobs that
he outlined, because his productivity would fall below competitive employment levels.
Counsel continued: "[a]ssume the same hypothetical as given by the ALJ, but assume
the individual must be very guarded and, thus, slow in her movements at all times to
avoid painful spasms and their productivity level would be reduced by 20%." VE opined
that, because of those additional restrictions, such a person a would miss an additional
forty-five minutes a day of work, which is incompatible with competitive employment.

In response to further questioning by the ALJ, the VE confirmed that a 20%

---

[7] The region is Wilmington and Newark, Delaware and Cecil County, Maryland.

decrease in productivity would disqualify one from the competitive workforce.

**ALJ's Decision**

In his detailed decision on July 25, 2006, the ALJ concluded the following

regarding plaintiff's claim for SSI:

> 1. The claimant has not engaged in any substantial gainful activity since May 26, 2000, the date of the alleged onset of disability.
> 2. Claimant's degenerative disc disease of the lumbosacral spine with lumbar radiculopathy, cervical and lumbar strain and lumbar pain syndrome are "severe" impediments based on the requirements of Regulation 20 CFR 416.920 (c) because they significantly affect individual's ability to perform basic work activities. Claimant's headaches do not occur with functionally limiting frequency and intensity and, therefore, are not "severe".
> 3. Claimant does not have any impairment that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR § § 416.920(d), 416.925, 416.926).
> 4. The undersigned found that claimant's subjective statements as to intensity, persistence and limiting effects of pain are not entirely credible.
> 5. Claimant has a residual functional capacity to sit up to six hours and stand and walk up to two hours in an eight-hour workday, lift weights of up to ten pounds occasionally and she must avoid overhead reaching, and cannot work around temperature extremes. She requires a sit/stand option and is limited to performing sedentary–simple, routine and unskilled–jobs.
> 6. Claimant is unable to perform any past relevant work.
> 7. Claimant is a younger individual age 18-44.
> 8. Claimant has at least a high school education and is able to communicate in English.
> 9. Claimant has acquired work skills from her past relevant work.
> 10. Although claimant's additional limitations do not allow the claimant to perform a full range of sedentary work, there are jobs that exist in significant numbers in the national economy that applicant can perform, based on age, education, work experience, and residual functional capacity for limited range of light sedentary work, as outlined in the framework of Medical-Vocational Rules.
> 11. The claimant has not been under a "disability," as defined in the Social Security Act, since November 5, 2004, the date application was filed.

**Standard of Review**

This court's review is limited to determining whether the final decision of the

Commissioner is supported by substantial evidence.

> Substantial evidence is less than preponderance but more than a mere
> scintilla.  It is such relevant evidence as a reasonable mind would accept
> as adequate support for conclusion.  It must do more than create a
> suspicion of the existence of a fact to be established . . . it must be enough
> to justify, if the trial were put to a jury, a refusal to direct a verdict when the
> conclusion sought to drawn from it is one of fact to the jury.[8]

The Supreme Court has embraced a similar standard for determining summary

judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there
> is a need for a trial–whether, in other words, there are any genuine factual
> issues that properly can be resolved only by a finder of fact because they
> may reasonably be resolved in favor of either party.
> This standard mirrors the standard for a directed verdict under Federal
> Rule of Civil Procedure 50(a), which is that the trial judge must direct a
> verdict if, under the governing law, there can be but one reasonable
> conclusion as to the verdict.  If reasonable minds could differ as to the
> import of evidence, however, a verdict should not be directed.[9]
> 
> Overall, this test is differential and this court must give deference to
> agency inferences from facts if those inferences are supported by
> substantial evidence, even where a court acting *de novo* might have
> reached a different result.
> 
> Furthermore, evidence taken as a whole must be sufficient to
> support a conclusion by a reasonable person, not just the evidence
> consistent with agency's decision.
> Thus, a single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is the evidence substantial if it is
> overwhelmed by other evidence – particularly certain types of evidence
> (e.g. that offered by treating physicians) – or if it really constitutes no
> evidence but a mere conclusion.[10]

Where, for example, countervailing evidence consists primarily of claimant's

subjective complaints of disabling pain, the ALJ "must consider the subjective pain and

---

[8] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).
[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).
[10] *Monsour Med. Ctr. v . Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[11]

Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[12]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[13]

**Disability Determination Standard**

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[14]  A claimant – in order to establish SSI eligibility – bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than 12 months.[15]  Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work

---

[11] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990)

[12] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[13] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[14] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).

[15] 42 U.S.C. § 423(d)(1)(A).

experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy.[16]  Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.[17]

**Five-Step Test.**

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[18]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.

---

[16] 42 U.S.C. § 423(d)(2)(A).

[17] 42 U.S.C. § 423(d)(3).

[18] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

17

The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[19]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis stops.[20]

### Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[21]   Moreover, it will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on record.[22]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[23]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[24]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the Commissioner

---

[19]  *Plummer*, 186 F.3d at 427.
[20] *See* 20 C.F.R § 404.1520(a)
[21] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)
[22] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[23] *Morales v. Apfel*, 225 F.3d 310, 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).
[24] *Plummer*, 186 F.3d at 429.

18

because it is an administrative finding that is dispositive of the case.[25]   Therefore, only the ALJ can make a disability determination.

### Evaluation of Subjective Accounts of Pain[26]

 Statements about the symptoms[27] alone never establish the existence of any impairment or that an individual is disabled.  The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the individual's symptoms.  Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the individual:  it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

---

[25] *See* 20 C.F.R. § 416.927 (e)(1).
[26] *See* 20 C.F.R §§ 416.928-29. *See also* SSR 96-7p.
[27] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints. *See* SSR 96-7p.

**Severity of Pain**

At step two, the ALJ must determine the extent to which the symptoms limit the applicant's ability to do basic work activities.  Therefore, he must determine claimant's credibility.[28]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the individual's statements about symptoms, any other information provided by treating or examining physicians and psychologists, and any other relevant case-record evidence.  This may include the claimant's account of how the symptoms affect his activities of daily living ("ADLs") and ability to work.[29]

Where more information is needed to assess an individual's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on the credibility of statements.  Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

> (I) The applicants' account of daily activities;
> (ii) The location, duration, frequency, and intensity of pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;
> (v) Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;
> (vi) Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning functional limitations and restrictions due to

---

[28] Credibility is the extent to which the statements can be believed and accepted as true.
[29] *See* 20 C.F.R. § 404.1529.

pain or other symptoms.[30]

**Factors in Evaluating Credibility**

An Individual's statements and reports from medical sources and other persons with regard to the seven factors, noted above, along with any other relevant information in the record, provide the ALJ with an overview of the individual's subjective complaints.

The adjudicator must then evaluate all of that information and draw appropriate inferences and conclusions about the credibility of the individual's statements.

A strong indication of the credibility of an individual's statements is their consistency, both internally and with the record, particularly medical findings.  Also, the effects of symptoms can often be clinically observed, and when present, tend to lend credibility to an individual's allegations.  Therefore, the adjudicator must always attempt to obtain any available objective medical evidence concerning the intensity and persistence of pain or other symptoms, and must consider it in evaluating the individual's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress and generally lend support to an individual's allegations.  An individual's statements, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not compliant with the prescribed

---

[30] *See* 20 C.F.R. § 404.1529

treatment and there are no good reasons for this failure.

ALJ must consider findings of fact by state agency medical and psychological consultants and other program physicians and psychologists about the existence and severity of an individual's impairments, including the existence and severity of any symptoms and opinions of non-examining physicians and psychologists. Such opinions are not given controlling weight. Furthermore, the ALJ, although not bound by such findings, may not ignore them and must explain the weight applied to those opinions in his decision.

The ALJ cannot make a disability determination based solely on a credibility finding and must consider the whole record before making a decision. However, the ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain –  provide sufficiently specific reasons that find support in the record – to the individual and any subsequent reviewers the weight that the ALJ applied to an individual's statements and the reasons therefore.

**Plaintiff's Contentions**

Plaintiff maintains that the ALJ failed to consider her subjective accounts as to the intensity and persistence of symptoms, and therefore, the finding on residual functional capacity of light sedentary work in Step 5 of the disability determination process is not based on sufficient evidence.

Plaintiff specifically complains that: the ALJ did not explain why he gave "less than credible" weight to her subjective accounts of pain; the ALJ based his credibility

findings on conclusory statements and substituted his own judgment for that of her treating physician, Dr. Grossman; and, the ALJ failed to fully consider her testimony and written statements as to the structural rigidity of her daily routine because he did not mention them in the decision.

**Defendant's Contentions**

Defendant contends that the ALJ properly assessed plaintiff's subjective complaints of pain when he considered the objective medical evidence, ADLs, and other evidence on record.  Specifically, defendant maintains that responsibility for determining whether plaintiff is disabled is reserved for the Commissioner, not plaintiff's treating physician. Furthermore, defendant asserts that the ALJ properly discussed his analysis of subjective complaints in the decision.  Because no deference is a requirement for a claimant's subjective testimony, the defendant argues that the ALJ satisfies the substantial evidence burden where he shows that the claimant's subjective accounts of limitations were given "serious consideration."[31]

**Discussion**

**Application of the Five-Step Sequence**

In the instant matter, only step five is at issue, where the Commissioner has the burden of showing that the claimant is capable of performing work and is not disabled. The first four steps are not contested.[32]  The vocational expert testified that plaintiff could

---

[31] *Mason v. Shalala*, 944 F.2d 1067 (3d Cir. 1993).

[32] The findings for those steps are:  (1) The claimant has not engaged in any substantial gainful activity since the date of the alleged onset of disability; (2) her degenerative disc disease of the lumbosacral spine with lumbar radiculopathy, cervical

work as an assembler (600 regional and 125,000 national jobs), a hand packer (100

regional and 15,000 national jobs), and a product inspector (200 regional and 30,000

national positions).  The vocational expert's testimony is consistent with the information

contained in the Dictionary of Occupational Titles.

The ALJ also considered plaintiff's age, education, and transferrable work skills in

finding that she is not disabled as defined in the Social Security Act.

### Application of the Symptoms Test and Credibility Determination.

At step one, the ALJ found that impairments, proven by medically acceptable

clinical and laboratory diagnostic data, could reasonably be expected to produce her

symptoms.  He relied on the positive findings of disc bulging and forminal herniations on

the lumbar x-rays and MRI, and the cervical and lumbar tenderness and the lower

extremity pain with lumbosacral radiculopathy found during the physical examinations.

Those impairments, however, did not meet or medically equal any impairments listed in

20 CFR Part 404, Subpart P, Appendix 1.

In evaluating plaintiff's credibility, the ALJ considered, as required by SSR 96-7,

her testimony, her subjective complaints as contained in the record, the ADLs, medical

history, the opinions of treating sources and medical consultants, her history of seeking

---

and lumbar strain and lumbar pain syndrome are "severe" impediments, while
headaches are not "severe," (3) her medically determinable impairments do not meet or
medically equal any of the listed impairments presumed severe enough to preclude any
gainful employment; and (4) she is unable to perform any past relevant work.  Only the
ALJ's determination under step 5, that the Commissioner satisfied the burden of
providing evidence of jobs which exist in the national economy in significant numbers
that a person with residual functional capacity for limited range of light sedentary work
and a requirement for a sit/stand at will option can perform, is disputed.

treatment, the nature of her medical care and medication history, as well as, the facts evinced at the hearing.

The ALJ did not find claimant's testimony as to debilitating effects of pain to be entirely credible.  He pointed to inconsistencies in her testimony and medical records. The ALJ explained that the medical evidence, or lack thereof, and plaintiff's admitted daily activities, although structured, contradicted her subjective accounts of severe and persistent chronic back pain which discounted her credibility.

As noted in his decision, the ALJ considered the conservative medical treatment plaintiff received of physical therapy, TENS, and pain medications.  He pointed out that the facet injections, nerve blocks and radio-frequency lesioning of the affected facet joints provided sustained pain relief for up to eight months.  He considered the lack of any hospitalization or surgical intervention for her condition, as well as, the absence of any neurological deficits.  The ALJ noted that despite a reported antalgic gait, no treating or consulting examiners recommended or prescribed an assistive device to stand or walk. The ALJ further observed that plaintiff is able to function by using a Lidoderm patch and applying ice packs, and elected not to take prescription medications, despite constant and unbearable pain.

The ALJ explained that plaintiff's admitted daily activities contained in her written statements and testimony reflect that she can perform light household chores, prepare simple meals, care for her seven year old son, shop by computer, pay bills and help her son with homework, at the same time she allegedly experiences chronic, unbearable back pain, medication side-effects, and a limited ability to sit, stand, walk, lift and carry.

Although the ALJ must consider the opinions of medical consultants, he does not, however, have to give their opinions controlling weight. The medical consultants, in the present matter, found that plaintiff has a residual functional capacity to sit for up to six hours and stand and walk for up to two hours in an eight-hour workday, and lift up to ten pounds occasionally. They found that she can occasionally climb, balance, stoop, kneel, crouch and crawl. The ALJ gave the consultants findings some, but not controlling weight, because they did not physically examine plaintiff and could not consider the medical evidence submitted after their review of the record.

The ALJ did give plaintiff's testimony and written statements some weight and considered some of her subjective complaints credible. He concluded that her condition prevented her from performing the full range of sedentary work, contrary to the findings of medical consultants. He determined that plaintiff's residual functional capacity allowed her to perform a reduced range of unskilled sedentary work and that she could sit for up to six hours and stand and walk for up to two hours and lift up to ten pounds occasionally. Thus, the ALJ rejected the medical consultants' findings that plaintiff can occasionally climb, balance, stoop, kneel, crouch and crawl. As a result, the ALJ reduced her residual functional capacity, and his conclusion is supported by substantive evidence.

### Conclusory Statements by ALJ and Findings of Dr. Grossman

The ALJ thoroughly addressed the medical findings of Dr. Grossman and correctly explained that his opinion on disability does not control and does not constitute an administrative finding dispositive of the case:

> The claimant's degenerative disc disease was mild to moderate and

not amenable to surgery. He opined that she was disabled by her pain, and while he encouraged her to obtain a repeat MRI of her back, she was lost to follow-up according to a February 27, 2002 letter.

Dr. Grossman opined that the claimant was "disabled". This is the opinion reserved to the Commissioner of Social Security Administration because it is an administrative finding that is dispositive of the case. It is the responsibility of the undersigned for making the decision on behalf of the Social Security Administration about whether claimant meets the statutory definition of disability, and doing so requires evaluation of all medical findings and other evidence that supports a medical source's statement that claimant is disabled. Limited weight was given to Dr. Grossman's opinion (not his medical findings) as it appears to have been based on a single examination in March 2001.

Although the ALJ must consider medical findings which support a treating physician's opinion that a claimant is disabled, he cannot give any weight to a doctor's opinion that the subject is disabled.  The ALJ's decision reflects medical findings consistent with those of Dr. Grossman, who opined that the medical tests revealed disc disease at L4-5 and mild to moderate degenerative changes at L3-4 and L2-3.  The ALJ's decision included those findings.  Therefore, the ALJ did not reject the medical findings of Dr. Grossman, only his opinion on disability, consistent with the statute.

Plaintiff also maintains that the ALJ's assessment of her lack of credibility is conclusory:

1. The objective medical findings and the nature of the medical treatment serve to discount her testimony to the frequency and severity of pain.

2. Ms. Reo's admitted activities of daily living . . . reflect an ability to perform light household chores, prepare simple meals, take care of her seven year old son, shop, pay bills, and help her son with his homework despite her allegedly chronic and severe pain, medication side effects, and reduced ability to carry.

The ALJ's conclusions are based on the evidence in the record, and his decision

adequately explains how he reached those findings.

**Plaintiff's Daily Activities**

Contrary to plaintiff's arguments, the ALJ's decision addresses her testimony of

subjective complaints of pain, functional restrictions and structured daily activities:

> Since that accident, she has experienced neck and back pain,
> muscle spasms, reduced neck flexion, and arm weakness.  She said she
> cannot lift her arms and hands over her head, cannot lift a gallon of milk on
> consistent basis, stand for more than five minutes without support, or sit
> more than twenty minutes before experiencing muscle spasms.  She is able
> to walk at a slow pace for short distances, stopping as necessary.  She
> sometimes uses a cane.  Physical activity triggers muscle spasms.  Ms.
> Reo does not drive . . . .  Ms. Reo is able to take care of her personal needs
> unassisted, and can perform light household chores at a slow pace.  Her
> mother accompanies her when she shops.  Her son assists her with her
> laundry by putting the clothes in the washer and dryer for her: the claimant
> is able to fold the laundry . . . The claimant has to sit in chairs with arms;
> even in a car she has to use her arms on to relieve her pain.
>
> Ms. Reo reiterated her subjective complaints of pain and functional
> restrictions in her written statements for the record . . ..  She completed a
> description of her activities of daily living on February 18, 2005, at which
> time both of her sons (ages 6-16) were living with her.  She assisted her
> younger son in getting ready for school, prepared simple meals, performed
> light household chores, and shopped with her mother.  The claimant noted
> that her sons assisted with tasks that entailed lifting and bending (such as
> laundry).  Ms. Reo advised that she performed household tasks at a slow
> pace and with periods of rest, and that even dressing and bathing took
> longer.  She stated that she was able to shop by computer, mail and
> telephone, pay bills, and help children with homework.

The ALJ's detailed summary of subjective complaints noted above includes

multiple references to the structure of her daily activities, and specifically, the time,

precautions and assistance she requires.  Therefore, plaintiff's contention that the ALJ

failed to consider her subjective complaints and structured daily activities is without merit.

Further, the ALJ's decision in this regard is supported by substantial evidence, because

the ALJ described in detail the evidence he considered, and sets out specific reasons as to his finding on credibility.

Ultimately, at issue in this case is the ALJ's finding on plaintiff's workplace productivity level at Step 5 of the disability determination process.  The ALJ considered the vocational evidence regarding the existence of jobs in the national economy which plaintiff can perform, and thus found her "not disabled."  The medical consultants recommended that plaintiff could perform sedentary employment.  Plaintiff's counsel argued for 20 percent reduction in productivity to be applied due to her structured lifestyle.  The ALJ's finding that plaintiff is able to perform a reduced range sedentary work did not fully accept the medical consultants' recommendation, nor completely reject plaintiff's arguments.  In his decision, the ALJ enumerated the evidence he considered, which was all the evidence presented.  The ALJ provided sufficiently specific reasons for his finding on credibility, as previously discussed herein.  Therefore, the ALJ's opinion is supported by substantial evidence.

**ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, I recommend that:

(1) Defendant's cross-motion for summary judgment (D.I. 14) be GRANTED.

(2) Plaintiff's motion for summary judgment (D.I. 10) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1).  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.  Fed. R. Civ. P. 72(b).

29

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is available on the Court's website, www.ded.uscourts.gov.

June 26, 2009                                /s/ Mary Pat Thynge                     
                                            UNITED STATES MAGISTRATE JUDGE

30